49 F.3d 1154
 Velma M. PRAY and Joe N. Pray, Plaintiffs-Appellees,
v.
CITY OF SANDUSKY, et al., Defendants,
Phillip Frost, Officer, Sandusky Police Department; Curt
Muehling, Captain, Sandusky Police Department;
C.W. Sams, Officer, Sandusky Police
Department, Defendants-Appellants.
 No. 93-4284.
 United States Court of Appeals,
Sixth Circuit.
 Submitted Feb. 3, 1995.
Decided March 21, 1995.
 
 Marc G. Williams-Young, Spitler & Williams-Young, Toledo, OH (briefed), for plaintiffs-appellees.
 Mark B. Marein, Synenberg & Marein, Cleveland, OH (briefed), for Frost.
 Paul F. Meyerhoefer (briefed), Carpenter, Paffenbarger, McGimpsey & Meyerhoefer, Norwalk, OH, Mark B. Marein, Synenberg & Marein, Cleveland, OH, for Curt Muehling, C.W. Sams.
 Before: MERRITT, Chief Judge; BROWN and BATCHELDER, Circuit Judges.
 BROWN, J., delivered the opinion of the court, in which MERRITT, C.J., joined. BATCHELDER, J. (pp. 1161-62), delivered a separate opinion concurring in the result.
 BAILEY BROWN, Circuit Judge.
 
 
 1
 The plaintiffs, Velma and Joe Pray, brought a civil rights suit under 42 U.S.C. Sec. 1983 against various police officers and a municipality alleging an illegal search and seizure and excessive force in violation of the Fourth Amendment. After removal to federal court, the defendants filed a motion for summary judgment. The individual defendants relied in part on the affirmative defense of qualified immunity. The district court denied the motion, finding that genuine issues of material fact still exist. Three of the individual defendants, police officers Phillip Frost, Charles Sams, and Curtis Muehling, now bring this interlocutory appeal challenging the district court's order. We agree that genuine issues of material fact remain with respect to the defense of qualified immunity, and therefore, conclude that summary judgment is inappropriate. We AFFIRM.
 
 I.
 
 2
 In December 1989, members of the Erie County Drug Task Force were conducting an investigation of Peter Giles, a twenty-five year old male suspected of engaging in illegal drug activity from his residence in Sandusky, Ohio. A search warrant was issued on December 18 for Giles' residence, and during that search, police officers seized marijuana, hydrocodone (a schedule II controlled substance), a crack pipe, and other drug paraphernalia.
 
 
 3
 Giles' residence, 716 1/2 Erie Street, is the upper level of a duplex home, while 716 Erie Street is the lower level of the duplex and is occupied by the plaintiffs, Joe and Velma Pray, an elderly couple. The duplex contains a common vestibule with one door opening immediately to a flight of stairs by which the Giles' upper flat is reached, and one door opening directly into the lower flat occupied by the Prays.[1] Neither door in the vestibule was identified by number or name.
 
 
 4
 Subsequent to the search, the police gathered information that Giles was continuing to engage in illegal activities. The police therefore secured a second warrant for his residence. On February 1, 1990, approximately six weeks after the first search, police officers Curtis Muehling, Charles Sams, Phillip Frost, Paul Schnittker, and Tim McClung (the "team") held a pre-raid briefing to study a layout of Giles' upstairs apartment and to plan the execution of the second warrant. Officers Muehling, Sams, and Schnittker were present during the execution of the previous warrant, and therefore, knew that the team would have to enter the duplex's common vestibule and climb a flight of stairs to reach Giles' residence. After the meeting, the team went to the address, arriving at approximately 9:30 p.m. The team entered the vestibule and knocked on what it considered the "obvious" door. The team received no immediate response, and therefore, forced the door open. The "obvious" door, however, turned out to be the door leading to the Pray home. According to the Prays, the following sequence of events occurred: After knocking the door down, the officers swarmed the apartment and first encountered Mr. Pray; the officers backed Mr. Pray through the house at gunpoint and ordered him to get down on the floor; Officer Muehling placed his hands on Mr. Pray's shoulders and pushed him to the floor; another officer discovered Mrs. Pray in another part of the house and put his hands on Mrs. Pray's shoulders and pushed her to the floor; it appeared to Mr. Pray that the officers were searching for something; the officers remained for approximately four to five minutes securing and searching the Pray residence; the team then exited the Pray residence and effectuated the search on the upper flat; Officer Muehling later offered an apology to Mr. Pray, and damage to the door was promptly paid.
 
 
 5
 The Prays assert that as a result of the search, Mrs. Pray "blacked out," and suffered injuries to her arthritic knees, later requiring surgery. Mr. Pray suffered an attack of angina which required him to take nitroglycerine pills.
 
 
 6
 In January 1992, the Prays filed an action against the individual police officers involved in the raid.[2] The Prays contended that the police officers violated their rights secured under the Fourth Amendment of the United States Constitution, specifically the right to be free from illegal searches and seizures and excessive force. The defendants removed the case to federal court and then, after discovery, moved for summary judgment pursuant to FED.R.CIV.P. 56(c). Germane to this appeal, the individual defendants alleged in their motion that the Prays failed to set forth a cognizable claim, and alternatively, that they are protected from suit based on their qualified good-faith immunity. The district court denied the defendants' motion, concluding that genuine issues of material fact exist with respect to the defense of qualified immunity. Three of the police officers--Frost, Sams, and Muehling--have brought this interlocutory appeal.
 
 II.
 
 7
 We have jurisdiction to review the qualified immunity issues because an order denying a summary judgment motion based on qualified immunity is immediately appealable as a final judgment under the collateral order doctrine. Walton v. City of Southfield, 995 F.2d 1331, 1335 (6th Cir.1993). Review of a denial of a qualified immunity claim raises an issue of law, and is therefore reviewed de novo. Yates v. City of Cleveland, 941 F.2d 444, 446 (6th Cir.1991). The court reviewing a motion for summary judgment must consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," presented by both parties, drawing all reasonable inferences in a manner most favorable to the non-moving party. FED.R.CIV.P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).
 
 
 8
 Government officials who perform discretionary functions are generally entitled to qualified immunity and are protected from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In other words, qualified immunity is appropriate either on the basis that the right allegedly violated was not at the time "clearly established," or if "clearly established," was one that a "reasonable" person in the defendant's position could have failed to appreciate would be violated by his conduct. Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). The standard is one of objective reasonableness, analyzing claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendants' position could have believed that his conduct was lawful, in light of clearly established law and the information he possessed. Id.; Adams v. Metiva, 31 F.3d 375, 386 (6th Cir.1994) ("[T]he question is whether any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct.") (quoting Brandenburg v. Cureton, 882 F.2d 211, 215 (6th Cir.1989)). Thus, officials are "entitled to qualified immunity [when] their decision was reasonable, even if mistaken." Castro v. United States, 34 F.3d 106, 112 (2d Cir.1994). Moreover, "[if] officers of reasonable competence could disagree on this issue, immunity should be recognized." Malley v. Briggs, 475 U.S. 335, 349, 106 S.Ct. 1092, 1100, 89 L.Ed.2d 271 (1986) (Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."); see also Hunter v. Bryant, 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).
 
 
 9
 The defendant as the movant in a motion for summary judgment must show that no genuine issues of material fact remain that would defeat his claim of qualified immunity. The plaintiff, however, carries the burden to allege and prove that the defendant official violated a clearly established right of which a reasonable person would have known. Adams v. Metiva, 31 F.3d 375, 386 (6th Cir.1994). Thus, when a defendant moves for summary judgment based on qualified immunity, the plaintiff must: 1) identify a clearly established right alleged to have been violated; and 2) establish that a reasonable officer in the defendant's position should have known that the conduct at issue was undertaken in violation of that right. Johnson v. Estate of Laccheo, 935 F.2d 109, 111 (6th Cir.1991); see also Adams v. Metiva, 31 F.3d 375, 386 (6th Cir.1994); Russo v. City of Cincinnati, 953 F.2d 1036, 1043 (6th Cir.1992).
 
 III.
 
 10
 The plaintiffs have alleged that the police officers violated their Fourth Amendment rights to be free from unreasonable searches and seizures and excessive force. Both rights are clearly established rights of which a reasonable official would know. Graham v. Connor, 490 U.S. 386, 392-93, 109 S.Ct. 1865, 1869-70, 104 L.Ed.2d 443 (1989); California v. Hodari, 499 U.S. 621, 624-25, 111 S.Ct. 1547, 1549-50, 113 L.Ed.2d 690 (1991). The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. CONST. amend. IV. From this constitutional protection, it is well established that a warrantless search and seizure is unreasonable absent probable cause and exigent circumstances. See Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980); United States v. Radka, 904 F.2d 357, 360 (6th Cir.1990). Moreover, with respect to an excessive force claim, in Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989), the Supreme Court held that all claims alleging "that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard...." A determination of whether the force used was reasonable under the Fourth Amendment "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396, 109 S.Ct. at 1871 (citation omitted).[3]
 
 
 11
 In the instant case, taking the plaintiffs' sworn allegations of fact and all reasonable inferences therefrom as true, as we must do in reviewing the denial of a summary judgment motion, the plaintiffs have sufficiently alleged violations of the Fourth Amendment. The entry and subsequent search and seizure was done without a warrant--the warrant only cited Giles at 716 1/2 Erie Street--and no exceptions to the warrant requirement apply with respect to the search of the Pray home. The record clearly shows that the officers, without authority, entered the Pray residence and conducted an illegal search and seizure. Moreover, the Prays had a clear right not to be physically forced to the floor at gunpoint. Thus, if the circumstances were such that the application of force was clearly unnecessary and unreasonable, then the defendants' use of force would be considered excessive. We therefore conclude that, as an initial matter, the plaintiffs have sufficiently alleged and supported violations of their clearly established constitutional rights.
 
 IV.
 
 12
 The defendants do not contest, for the most part, that the actions complained of did in fact occur. Rather, the officers contend that these actions are protected by their qualified good-faith immunity. The officers contend that because these actions took place as a result of their mistake of fact under the circumstances, i.e., they thought that they were in fact executing the search warrant on the correct residence, a reasonable officer in the defendants' position would not understand that their actions were in fact violating the plaintiffs' clearly established constitutional rights. Thus, we must determine whether the summary judgment record shows that any reasonable officer in the defendants' position would know that his conduct at issue violated the Prays' clearly established rights.
 
 1. The forcible entry
 
 13
 The plaintiffs contend that since several of the defendants involved in the raid had also been present during the previous warrant execution, the forcible entry into their home was clearly unreasonable. On the other hand, the officers contend that, under the circumstances, their mistake in forcibly entering the Pray home was a reasonable one. The defendants were in the process of carrying out a raid at night on the premises of a suspected drug dealer. The officers simply claim that they missed the correct door. We agree that a reasonable officer in the defendants' position could have believed that he was initially entering the correct residence described on the warrant. Police officers "are regularly forced to make critical decisions under extreme pressure--decisions which may seem much easier after facts have unfolded and time for reflection has been afforded." Taylor v. Farmer, 13 F.3d 117, 120 (4th Cir.1993). Given the circumstances at the time of entry, it appears that the officers had to make a quick judgment in what was initially a tense situation. At the time the officers entered the Pray home, it was dark, vision was poor, and any delay could have been potentially detrimental to an arrest of Giles and seizure of evidence. The circumstances surrounding the search six weeks earlier, however, were significantly different--it was not a raid, it was daylight, and Giles' door leading to the stairs was open to the officers. Thus, we conclude that the initial mistake in entering the Pray home was a reasonable one under the circumstances, and therefore, protected by qualified immunity.
 
 2. The subsequent searches and seizures
 
 14
 The parties agree that the officers were obligated to retreat as soon as they knew or reasonably should have known that there was a mistake, i.e., they were in the wrong residence. See Maryland v. Garrison, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1986). Thus, we must determine what searches and seizures, if any, took place after the mistake was known. It seems to this court that, as a legal matter, any search or seizure that occurred while the officers were under the mistaken but reasonable belief that they were in fact executing the warrant at the correct residence would be protected by qualified immunity. Conversely, any search or seizure that took place after the officers knew or reasonably should have known that they were in the wrong residence would no longer be protected by qualified immunity. A "reasonable" officer would know that such warrantless searches and seizures would violate the plaintiffs' constitutional rights. See, e.g., Castro v. United States, 34 F.3d 106 (2d Cir.1994).
 
 
 15
 The defendants contend that once "we realized we had entered the wrong suite [we] retreated and ... ultimately proceeded to the Giles' residence." Muehling Affidavit, J.A. at 44. According to the defendants, when the Prays' door came down, "things happened so fast they were over in what seemed like seconds." Id. at 44-45. Thus, the defendants again contend that although they were mistaken in entering the Pray home, they retreated upon learning of their mistake, and therefore, any searches and seizures that they committed cannot be considered unreasonable.
 
 
 16
 On the other hand, the Prays assert a substantially different version of what occurred. The Prays contend that at least some, if not all, of the defendants knew immediately or very shortly after knocking the door down that they were in the wrong place. In support, the Prays offer the deposition testimony of the officers. Officer Sams testified that when the "door came down" he saw that "it was the wrong place." Frost testified that he knew that when the door was kicked in he was "supposed to be going upstairs" and that "this isn't the right place." The Prays further contend that after the forcible entry into their home, the defendants did not stop and retreat, but rather, illegally proceeded through the house. Mr. Pray stated in his account of the facts that the officers were looking for something (or someone), i.e., they were conducting a search. Mr. Pray offers, for example, the fact that the officers obviously had to proceed through the house to confront Mrs. Pray in another part of the house. The Prays further contend that despite knowing that they were in the wrong place, the defendants nevertheless "secured" the Pray residence for an additional four to five minutes. The Prays assert that a reasonable officer in defendants' position would, once momentarily entering and becoming aware of the mistake, promptly exit. Thus, according to the Prays, even if the forcible entry into the Pray home was an "honest" mistake, their actions in proceeding through the house and manhandling the Prays violated clearly established law and exceeded the bounds of the officers' qualified immunity.
 
 
 17
 As noted, we recognize the need to allow some latitude for honest mistakes that are made by officers in such dangerous and difficult situations. Smith v. Freland, 954 F.2d 343 (6th Cir.1992). Nevertheless, we conclude that a genuine issue of material fact still remains to determine which, if any, of the illegal searches and seizures took place after the officers discovered or reasonably should have discovered that they were in fact in the wrong residence. It is for the trier of fact to determine, based on the credibility of the evidence before it, at what point the officers knew or reasonably should have known they were at the wrong residence, and to determine what searches and seizures occurred after that.
 
 3. The use of excessive force
 
 18
 The Prays further contend that the defendants' use of force was excessive. The Prays allege that under the totality of the circumstances, a "reasonable" officer would know that such force would violate the Prays' clearly established rights, and therefore, qualified immunity should not be granted.
 
 
 19
 The defendants claim, however, that physically forcing the Prays to the floor was reasonable under the circumstances. The officers note that they were engaged in a "drug raid" that could have become potentially dangerous. Requiring the defendants to lay on the floor is a standard procedure used in such situations, the officers contend, to protect both the officers and the parties involved. Nevertheless, we conclude that we are again left with a genuine issue of material fact yet to be determined: What acts complained of, if any, occurred after the officers knew or under the circumstances should have known that they were in the wrong residence? If the trier of fact finds that at the time the use of force occurred, the circumstances were such that it would be reasonable to believe that the officers might be in danger of serious bodily injury, then as a legal matter, a reasonable officer could believe that such force would not constitute a constitutional violation. Conversely, if the trier of fact determines that the defendants did in fact know that they were in the wrong residence and nevertheless physically forced either Mr. or Mrs. Pray to the floor when no threat of danger was involved, then a reasonable officer would know that such conduct would violate the plaintiffs' constitutional rights. For, once the officers realized they were in the wrong residence, they had a duty to retreat and the need for the application of force, absent other factors, would be non-existent. Thus, the use of force after that point would be excessive and no longer cloaked with qualified immunity.
 
 
 20
 We realize that qualified immunity is a question of law and should be resolved at the earliest possible moment. Nevertheless, summary judgment is not appropriate if there are factual disputes involving an issue on which the question of immunity turns, "such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights." Poe v. Haydon, 853 F.2d 418, 426 (6th Cir.1988), cert. denied, 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989). As stated by a panel of this court, many times "the jury becomes the final arbiter of [defendants'] claim of immunity, since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." Brandenburg v. Cureton, 882 F.2d 211, 215-16 (6th Cir.1989). At bottom, it is for the trier of fact, not the court, to make credibility determinations with respect to what searches, seizures, and applications of force, if any, took place after the defendants knew or should have known of their mistake and were required to retreat. The district court's denial of summary judgment was appropriate. Therefore, we AFFIRM.
 
 
 21
 BATCHELDER, Circuit Judge.
 
 
 22
 I concur in the result reached by the majority in this case, and in much of the reasoning. I write separately because I believe that there is a critical element of this case that the majority fails to address.
 
 
 23
 The plaintiffs in this case alleged, and the defendants conceded, that the City of Sandusky police department policy required police officers executing a warrant to secure the premises being searched by placing all occupants on the floor, and that the officers who entered the Prays' apartment[1] acted pursuant to this policy when they ordered the plaintiffs to the floor. Sams affidavit at 63-66; Complaint p 34, at 6.
 
 
 24
 It seems to me that in order to determine whether any of the searches and seizures violated the clearly established rights of these plaintiffs, we must look at more than just the issue addressed by the majority, that is, whether these searches and seizures occurred after the officers realized that they were in the wrong apartment. Rather, we must look also at the constitutionality of the City's policy of securing premises, and whether, in effecting that policy in this situation, the officers violated any clearly established rights.
 
 
 25
 It is important to note here that in the order appealed by the defendant, the district court held that it "cannot find that [the City's securing of premises] policy is unconstitutional on its face."[2] If the policy to secure premises was not clearly unconstitutional, then that fact must guide a court's analysis of whether the officers receive immunity. The officers are entitled to immunity for all their non-discretionary acts performed in good faith pursuant to the policy. See Kentucky v. Graham, 473 U.S. 159, 166-67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (stating that immunity is given for "objectively reasonable reliance on existing law"). As the record demonstrates, however, the policy left much to the discretion of the officers. The bulk of the officers' behavior at issue here consisted of discretionary acts and therefore was governed by traditional qualified immunity analysis. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) ("[G]overnment officials performing discretionary functions generally are shielded from liability...."). Thus, if the policy was not unconstitutional, then the officers are entitled to qualified immunity for their actions taken to secure the premises unless they used excessive force.
 
 
 26
 Because the policy dictates that in every execution of a warrant the officers shall secure the premises by putting all occupants on the floor, the policy does not distinguish between searches of the correct premises and searches of the wrong premises. I agree with the majority that the officers are entitled to qualified immunity for their "initial mistake" of entering the wrong premises, but I also would hold that those officers are entitled to immunity for their actions in securing those premises, so long as those actions did not exceed the City's policy of securing the premises and did not involve excessive force.
 
 
 
 [1]
 The door in the vestibule leading to the Pray home is actually the back door to the lower flat. The front entrance to the lower flat is on the opposite side of the building
 
 
 [2]
 The Prays also brought a municipal liability claim against the City of Sandusky. The city, however, not entitled to the qualified immunity defense, could not appeal the denial of its summary judgment motion
 
 
 [3]
 Reasonableness must be judged "from the perspective of the reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396, 109 S.Ct. at 1872
 
 
 [1]
 Exactly which officers actually ordered the plaintiffs to the floor is in dispute
 
 
 [2]
 The court went on to hold that the City was not entitled to summary judgment because a genuine issue of material fact remained as to whether the execution of that policy was the proximate cause of the plaintiffs' injuries